# 14-193pr

To Be Argued By:
BRETT DIGNAM
Counsel for Appellee Scott Lewis

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————

**SCOTT LEWIS,**
*Petitioner-Appellee*

v.

**CONNECTICUT COMMISIONER OF CORRECTION,**
*Respondent-Appellant*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

———————

**BRIEF FOR PETITONER-APPELLEE**

———————

Brett Dignam
Elora Mukherjee
Counsel for Appellee Scott Lewis
Morningside Heights Legal Services, Inc.
435 West 116th Street, Room 831
New York, NY 10027
Telephone: 212-854-4291
Fax: 212-854-3554
bdigna@law.columbia.edu

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF THE CASE................................................................3

    1. Relevant Facts...............................................................................3

        a. State Habeas Pleadings...........................................................4
        b. Michael Sweeney Testimony ..................................................4
        c. Lewis Criminal Trial Evidence .............................................5
        d. Habeas Appellate Court Record............................................7

    2. Relevant Rulings  .........................................................................7

        a. State Procedural History.........................................................8
        b. Federal Procedural History.....................................................10

SUMMARY OF THE ARGUMENT .....................................................12

ARGUMENT ........................................................................................13

    I.     The District Court Correctly Rejected the State's Claim that Mr.
           Lewis Had Procedurally Defaulted His *Brady* Claim............................13

        A. Standard of Review and Governing Law...........................................13

        B. The District Court Properly Ruled that Mr. Lewis Did Not Default
           His *Brady* Claim When He Chose to Rely on the Testimony of
           Michael Sweeney and the Transcripts of His Criminal Trial ...........15

           1. The State Misled the Connecticut Appellate Court About
              Litigation of the *Brady* Claim and About the Record in the
              Habeas Trial Court .................................................................17

i

2. The State Has Failed to Demonstrate That a Firmly Established Connecticut Adequate Record Rule Required Mr. Lewis to File the Habeas Court Transcripts ........................................................ 19

3. Requiring Mr. Lewis to Provide a Full Habeas Trial Transcript Would Constitute an Exorbitant Application of the Adequate Record Rule .................................................................................... 23

4. Mr. Lewis Provided All Transcripts Necessary to Resolve His *Brady* Claim on Appeal ................................................................ 24

C. The District Court Correctly Ruled that Mr. Lewis Adequately Briefed the Certification Issue ........................................................ 28

1. Mr. Lewis Complied with State Procedural Requirements by Briefing the Denial of Certification .............................................. 28

2. The Certification Briefing Requirement is Not an Independent and Adequate State Ground ........................................................ 32

a. The State does not articulate a clear standard that Mr. Lewis allegedly failed to meet .......................... 32
b. The State has failed to establish that the rule it asserts was "firmly established" and "regularly followed." .............................................................. 33

D. Even If This Court Finds Procedural Default, It Should Remand for an Evidentiary Hearing on Actual Innocence ............................ 35

1. The *Schlup*/*House* Standard ........................................................ 36

2. Mr. Lewis has Pled and Developed Extensive Evidence of Actual Innocence ........................................................................ 37

a. The Mather Investigation Focuses on Michael Cardwell .................................................................. 38
b. Vinnie Raucci, Frank Parise and the Fair Haven Drug Trade .................................................................... 39
c. Raucci Builds a Case Against Mr. Lewis .......................... 40

        d.  FBI Investigation and Raucci's Escalating
            Deterioration ................................................................... 41

        e.  DNA and Basilicato Photo Identification of Michael
            Cardwell ............................................................................ 42

II.    The District Court Correctly Granted Habeas Relief Under
     28 U.S.C. §2254(d) ................................................................... 43

A. The District Court Correctly Ruled that the State Habeas Decision
   Was Contrary To Clearly Established Law under §2254(d)(1) ........ 44

B. The District Court Correctly Ruled That The State Habeas Court
   Unreasonably Determined That All Exculpatory Information Had
   Been Furnished to The Defense Under §2254(d)(2) .......................... 46

   1. Applicable Law .......................................................................... 46

   2. The District Court Correctly Ruled that the Habeas Court's
      Decision That All Exculpatory Evidence was Furnished to the
      Defense was Erroneous and Unreasonable ................................... 47

      a.  The State Court Record Demonstrates that Michael
         Sweeney's *Morant* Testimony is Credible ................... 48

      b.  The Sweeney Testimony Undermines Confidence in
         the Verdict ................................................................... 54

CONCLUSION ............................................................................. 60

CERTIFICATE OF COMPLIANCE ....................................................... 61

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Pages**

*Banks v. Dretke,*
   540 U.S. 668 (2004)...................................................................... 44, 45, 47

*Birchler v. Gehl Company*,
   88 F.3d 518 (7th Cir. 1996) ..................................................................25

*Brady v. Maryland*,
   373 U.S. 83 (1963)...................................................................... passim

*Brattrud v. Town of Exline,*
   628 F.2d 1098(8th Cir. 1980) ................................................................23

*Burt v. Titlow*,
   ___U.S. ___, 134 S.Ct. 10 (2013)...................................................................46

*Calo-Turner v. Turner,*
   847 A.2d 1085, 83 Conn. App. 53 (2004) .........................................................22

*Castonguay v. Commissioner of Correction*,
   16 A.3d 676, 300 Conn. 649 (2011) ..................................................................29

*Chambers v. Mississippi*,
   410 U.S. 284 (1973).................................................................... 38, 56

*Coleman v. Thompson*,
   501 U.S. 722 (1991)..................................................................... 13, 14, 32

*Cone v. Bell*,
   556 U.S. at 470 (2009)..................................................................... 21,48

*Cotto v. Herbert,*
   331 F.3d 217 (2d Cir. 2003) ........................................................ 14, 15, 17, 24

*Coulthurst v. United States,*
   214 F.3d 106 (2d Cir. 2000) ..............................................................31

*Douglas v. Alabama,*
   380 U.S. 415 (1965)..................................................................... 13, 32

*F. Woodward Lewis, Jr. v. Statewide Grievance Comm.,*
   669 A.2d 1202, 235 Conn. 693 (1996) ..............................................................50

*Ford v. Georgia*,
   498 U.S. 411 (1991)..................................................................... 14, 17

*Fromson v. Advance Offset Plate, Inc.,*
   755 F.2d 1549 (Fed.Cir. 1985) .......................................................27

iv

*Garvey v. Duncan*,
485 F.3d 709 (2d Cir. 2007) ...............................................................33

*Giglio v. United States*,
405 U.S. 150 (1972).............................................................................44

*Green v. Travis*,
414 F.3d 288 (2d Cir. 2005) ...............................................................14

*Hankerson v. Comm'r of Correction*,
90 A.3d 368, 150 Conn.App. 362 (2014) ............................................33

*Harris v. Reed*,
489 U.S. 255 (1989).............................................................................14

*House v. Bell*,
547 U.S. 518 (2006)......................................................... 11, 37, 38, 58

*In re Lea T.*,
544 A.2d 1245, 15 Conn. App. 455 (1988) .........................................22

*Jackson v. Virginia*,
443 U.S. 307 (1979).............................................................................47

*Jefferson v. Comm'r of Correction*,
73 A.3d 840, 144 Conn.App. 767 (2013) ............................................34

*Kyles v. Whitley*,
514 U.S. 419 (1995)......................................................... 21, 22, 48

*Lee v. Kemna*,
534 U.S. 362 (2002)......................................................... 14, 15, 17, 33

*Lewis v. Comm'r of Correction*,
808 A.2d 1164, 73 Conn. App. 597 (2002) ........................ 8, 18, 19, 31

*Lozada v. Deeds*,
498 U.S. 430 (1991)...................................................................... passim

*McGaffin v. Roberts*,
479 A.2d 176, 193 Conn. App. 393 (1984) .........................................22

*McGinnis v. Gustafson*,
978 F.2d 1199 (10th Cir. 1992) ..........................................................23

*Monroe v. Kuhlman*,
433 F.3d 236 (2d Cir. 2006) ..................................................... 13, 15

*Morant v. State*,
2000 WL 804695 (2000)......................................................................48

v

*Morant v. State,*
  802 A.2d 93, 68 Conn.App. 137 (2002) ...........................................................49

*O'Halpin v. O'Halpin,*
  74 A.3d 465, 144 Conn. App. 671 (2013) ........................................................22

*Perez v. D & L Tractor Trailer School,*
  981 A.2d 497, 117 Conn. App. 680 (2009) ......................................................22

*Pleines v. Franklin Construction Company, Inc.,*
  621 A.2d 759, 30 Conn. App. 612 (1993) ........................................................22

*Reddick v. Comm'r of Corr.,*
  722 A.2d 286, 51 Conn.App. 474 (1999) .........................................................32

*Richardson v. Henry,*
  902 F.2d 414 (5th Cir. 1990) ......................................................................23

*Rivas v. Fischer,*
  687 F.3d 584 (2d Cir. 2012) ...........................................................................6

*Rose v. Clark,*
  478 U.S. 570 (1972)........................................................................................46

*Sanderson v. Steve Snyder Enterprises, Inc.,*
  489 A.2d 389, 196 Conn. 134 (1985) ..............................................................21

*Sawyer v. Whitley,*
  505 U.S. 333 (1992)........................................................................................36

*Schlup v. Delo,*
  513 U.S. 298 (1995)................................................................................ passim

*Simms v. Warden,*
  646 A.2d 127, 230 Conn. 608 (1994) ...................................................... passim

*Slack v. McDaniel,*
  529 U.S. 473 (2000)........................................................................................35

*Southwest Administrators, Inc. v. Lopez,*
  781 F.2d 1378 (9th Cir. 1986) ....................................................................23

*State v.Gaines,*
  651 A. 2d 1297, 36 Conn.App. 454 (1994) ......................................................34

*State v. Germain,*
  65 A.3d 536, 142 Conn.App. 805 (2013) .........................................................22

*State v. Horrocks,*
  747 A.2d 25, 57 Conn.App. 32 (2000) .............................................................37

vi

*State v. Lewis*,
   717 A.2d. 1140, 245 Conn. 779 (1998) ............................................48

*State v. McIntyre*,
   699 A.2d 911, 242 Conn. 318 (1997) ...............................................17

*State v. Ritrovato*,
   858 A.2d 296, 85 Conn.App. 575 (2004) .........................................50

*Stratoflex, Inc. v. Aeroquip Corporation*,
   713 F.2d 1530 (Fed.Cir. 1983) .......................................................27

*Tatem v. Comm'r of Correction*,
   667 A.2d 1295, 39 Conn.App. 813 (1995) .......................................35

*Taylor v. Comm'r of Corr.*,
   936 A.2d 611, 284 Conn. 433 (2007) ...................................... passim

*Triestman v. Federal Bureau of Prisons*,
   470 F.3d 471 (2d Cir. 2006) ...........................................................31

*Tutson v. Comm'r of Correction*,
   72 A.3d 1162, 144 Conn.App. 203 (2013) .......................................34

*United States v. Agurs*,
   427 U.S. 97 (1976)..........................................................................44

*United States v. Bagley*,
   473 U.S. 667 (1985) ................................................................ 21, 44

*Wetzel v Lambert*,
   ___ U.S. ___, 132 S.Ct. 1195 (2012).............................................45

*Wrighten v. Glowski*,
   232 F.3d 119 (2d Cir. 2000) ...........................................................23

## Statutes

28 U.S.C. §2254...............................................................................37
28 U.S.C. §2254(d)(1).............................................. 12, 43, 44, 45
28 U.S.C. §2254(d)(2)................................... 12, 44, 46, 56, 59
28 U.S.C. §2254(d) .................................................. 9, 43, 49, 58
28 U.S.C. §2254(e)(1)..............................................................46

**Connecticut Rules of Appellate Procedure**

Connecticut Practice Book § 60-5 .......................................................................15

Connecticut Practice Book § 61-10 ....................................................................15

Connecticut Practice Book § 80-1 .......................................................................28

**Rules**

Federal Rule of Appellate Procedure 28(a)(6)......................................................3

Federal Rule of Appellate Procedure 10(b) .........................................................23

Federal Rule of Appellate Procedure 10(c) .........................................................23

Federal Rule of Appellate Procedure 10(b)(1) .....................................................23

Federal Rule of Appellate Procedure 10(b)(2) .....................................................23

Ninth Circuit Rule 19..........................................................................................23

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

**SCOTT LEWIS,**

*Petitioner-Appellee*

v.                                      Docket No. 14-193pr

**CONNECTICUT COMMISIONER
OF CORRECTION,**

*Respondent-Appellant*

## BRIEF OF PETITIONER-APPELLEE SCOTT LEWIS

### PRELIMINARY STATEMENT

Mr. Lewis has maintained his innocence since day one.  A nineteen-month Federal Bureau of Investigation ("FBI") investigation, into both Detective Raucci's corruption and his manipulation of the Lewis and Morant convictions, documented pervasive state malfeasance and provided the evidentiary basis for Mr. Lewis' state habeas petition. While that petition was pending, former Sergeant Detective Michael Sweeney came forward to testify about previously undisclosed exculpatory and impeachment information --  statements made by Ovil Ruiz,  the only witness to connect Mr. Lewis to the crime.

1

The State's suppression of this critical exculpatory and impeachment material violated Mr. Lewis' due process rights guaranteed in *Brady v. Maryland*, 373 U.S. 83 (1963). In a case where not a scintilla of physical evidence implicated Mr. Lewis, Ovil Ruiz – a terrified, mentally ill teenager who became the State's key witness – had told veteran detective Michael Sweeney on January 13/14, 1991, that he (Ruiz) was not at the crime scene and knew nothing about the murders. Sweeney testified in detail about Raucci's "absolutely inappropriate" behavior when he coached and coerced Ruiz (who had lied to Raucci in another police investigation just the previous month) into giving a manufactured statement against Mr. Lewis.

When Mr. Lewis raised this evidence in his state habeas petition, the State convinced the habeas trial court to import a "due diligence" element into that court's *Brady* analysis, in contravention of clearly established federal law as determined by the Supreme Court.  Subsequently, the State misled the Connecticut Appellate Court into believing that Mr. Lewis had not raised a *Brady* claim in the habeas trial court.

On December 16, 2013, more than eighteen years after Mr. Lewis' conviction and multiple attempts to achieve vindication, the District Court (Haight, J.) determined that the State failed to disclose exculpatory and impeachment information and denied Mr. Lewis a constitutionally fair trial.  On February 24,

2

2014, after the State advised that it did not intend to retry Mr. Lewis, Judge Haight ordered his release from custody.

The State does not challenge the District Court's careful and detailed finding that Michael Sweeney provided credible evidence or the substantive federal ruling that the State withheld critical exculpatory and impeachment material in violation of its *Brady* obligations. Rather, it argues that threshold procedural considerations barred federal review and that principles of comity require deference, even if the state court ignored clearly established federal law or unreasonably determined the facts. The continued pursuit of erroneous and formalistic legal arguments in the context of a record that is replete with evidence of actual innocence constitutes a serious and fundamental miscarriage of justice.[1]

## STATEMENT OF THE CASE

Ignoring Federal Rule of Appellate Procedure 28(a)(6), which requires "a concise statement of the case," the State provides fifteen pages of largely irrelevant and erroneous information (Resp.Br. 1-15[2]).

1. Relevant Facts

The only facts relevant to this Court's determination are: (1) the allegations made in Count Two of the January 9, 2001 amended state habeas petition (A-131-

---

[1] A brief summary of actual innocence evidence is provided in Section I.D, *infra*.

[2] The brief filed by the State in this appeal will be referred to herein as "Resp.Br."

3

137); (2) the State's return and affirmative defense to Count Two of that petition
(A-143-145); (3) the content of Michael Sweeney's testimony during the Morant
Motion for New Trial that Mr. Lewis introduced into evidence as Exhibits 12 & 13
during his state habeas trial (ECF. Nos.[3] 75-8 & 9); (4) the transcripts of the 1995
criminal trial that Mr. Lewis introduced as Exhibit 15 during his state habeas trial
(ECF Nos. 75-10 thru 75-22); and (5) the record and arguments made in the state
habeas appeal, A.C. 22517 (S.A. 279-439[4]).

### a. State Habeas Pleadings

Mr. Lewis clearly pled a *Brady* violation in Count Two of his amended
habeas petition (A-131-137). The State responded to that claim with an affirmative
defense that pled in relevant part: "As to the allegations in Count Two that the
respondent failed to disclose certain allegedly exculpatory evidence, the petitioner
cannot obtain habeas review if the allegedly exculpatory evidence was either
known or reasonably available by due diligence to the petitioner" (A-145).

### b. Michael Sweeney Testimony

The District Court carefully summarized the Michael Sweeney testimony
and its introduction into evidence as a documentary exhibit during the Lewis
habeas trial (A-10-17). Sweeney testified that Ruiz denied three times that he had

---

[3] Electronic filings in the district court are referred to herein as "ECF No."

[4] The Supplemental Appendix filed with this brief is referred to herein as "S.A."

4

any knowledge of the Turner-Fields murders (A-15; S.A. 443, 446) and that Raucci had coached Ruiz by "detailing the whole case to him" (S.A. 443). He also testified that he repeatedly took Raucci out of the interrogation room and told him to "knock it off" (A-12; S.A.443-444). During cross-examination, Sweeney testified: "I felt that the person being interviewed was giving nothing independent, that it was all – he was just parroting back what Detective Raucci was telling him about the case" (S.A. 455). The State has never contended that it disclosed this information to Mr. Lewis or to defense counsel. The District Court appropriately found it "readily apparent" why defense counsel would have prized Sweeney's testimony -- it bore "directly on the credibility of the key witness at trial" (A-13).

### c. Lewis Criminal Trial Evidence

The State relies on Connecticut Supreme Court statements about "facts" that the jury reasonably could have found (Resp.Br. 2-5). Those statements were made without the benefit of veteran detective Michael Sweeney's testimony. Moreover, the "facts" are based exclusively on the testimony of Ovil Ruiz and a vague statement by Jose Roque, a witness who recanted immediately after Raucci coerced his false statement and who denied personal knowledge that Scott Lewis was involved in the homicide.[5]

---

[5] For a summary of trial evidence, see Section II.B.2(b), *infra*.

The State relies heavily on January and May, 1991 statements Ruiz made to the New Haven Police Department ("NHPD"). Those statements were not introduced into evidence during the criminal trial and were not considered by the jury. Raucci took the January statement after Ruiz had repeatedly told Sweeney that he knew nothing about the crime and after Sweeney had repeatedly rebuked Raucci for witness coaching.[6]

Roque insisted that Raucci, whose voice he identified on the tape (S.A. 186), fed him information and answers, stopped the tape repeatedly and told him what to say next each time the tape was stopped (*See, e.g.,* S.A. 190, 191).[7] Roque testified that he never heard a conversation between Morant and Mr. Lewis in late 1990 as he said that he had in his taped police statement (S.A. 187). He testified that Vinnie Raucci had told him to say that he had been at 149 Clay Street with Mr. Lewis and Morant (S.A. 188). He had known Raucci as a narcotics detective who had busted him (S.A. 194). Raucci picked him up and brought him to police headquarters to

---

[6] Raucci has never testified in any proceeding involving Mr. Lewis. Based on publicly available court documents and contemporaneous news articles, Mr. Lewis alleged: by February, 1996, following a NHPD Internal Affairs investigation, Raucci had been suspended without pay; in August 1997, he had been arrested in New Haven on domestic charges; he subsequently fled to New Mexico where he was involved in a four-hour standoff with FBI agents on July 15, 1999 (S.A. 58, 71, ¶¶ 182, 228, 230). This Court has cited such sources for useful context. *Rivas v. Fischer*, 687 F.3d 514, 520 n.4, 521 n.7 (2d Cir. 2012). Additional detail about Raucci is provided in Section I.D, *infra*.

[7] Sweeney's testimony about Raucci's coaching would also have corroborated this evidence.

make a statement (S.A. 192). Raucci told Roque that he needed to make a statement against Mr. Lewis, or Raucci would charge Roque with the crime and put him on a million dollar bond (S.A. 193). Roque also testified that he knew Raucci was involved in the drug trade, both as a consumer and seller (*id*). After the prosecutor read Roque's statement to the jury, Roque confirmed that all of the information was what the police told him to say (S.A. 189).

### d. Habeas Appellate Court Record

Mr. Lewis appealed the state habeas court's *Brady* ruling (S.A. 286-370; A-165). He provided the Appellate Court with a complete transcript of Michael Sweeney's testimony and a complete copy of both the criminal trial and probable cause hearing transcripts, each of which had been entered into evidence at the state habeas trial (S.A. 284-285; 390-391). The State inaccurately characterized the issues raised on appeal and asserted that issues raised by Mr. Lewis "were not litigated in or decided by the habeas court" (A-165; S.A. 381). In his reply brief, Mr. Lewis again specifically argued how his rights under *Brady* had been violated and insisted that the State had totally ignored his right to the undisclosed information revealed in Sweeney's testimony (S.A. 394-405).

### 2. Relevant Rulings

The only rulings presented for review are: (1) the ruling of the federal district court on procedural objections (A-157 thru A-173); and (2) the ruling of the

federal district court granting the petition (A-1 thru A-68). The issues presented require consideration of: (1) the 2001 state habeas court decision denying relief (A-72 thru A-74); (2) the record on appeal of the state habeas trial court decision (S.A. 278-285); and (3) the 2002 decision of that appeal in the Connecticut Appellate Court, *Lewis v. Comm'r of Corr.*, 73 Conn.App. 597 (2002).

### a.  State Procedural History

Mr. Lewis filed his state habeas petition on March 19, 1999.  On September 19, 2001, Judge Zoarski issued a decision denying relief on the January 2, 2001 amended habeas petition (A-72-74).

Following this denial, and in accordance with Connecticut practice, Mr. Lewis filed a petition for certification to appeal the habeas denial to the Connecticut Supreme Court on September 26, 2001. That petition was summarily denied on October 22, 2001. Mr. Lewis then filed an uncertified appeal to the Connecticut Appellate Court on November 13, 2001. The Connecticut Appellate Court issued a per curiam opinion stating that denial of the petition for certification to appeal did not result in an abuse of discretion and dismissed the appeal. *Lewis v. Comm'r of Corr.*, 73 Conn.App. 597 (2002).

The State describes at length "relevant proceedings in state court" and devotes two sections to Morant's Petition for a New Trial (Blue, J.) (Resp.Br. 6-14). Those proceedings are not part of the procedural history of this case.  Michael

Sweeney's testimony during the Morant proceedings was introduced as a documentary exhibit during the Lewis habeas trial. Judge Blue's assessment of Sweeney's credibility is relevant because he was the only state court judge who had an opportunity to listen to and watch Sweeney as he testified. His further analysis of that testimony in the context of the different Morant evidence is entirely irrelevant.[8]

Lewis and Morant were tried separately. The evidence against Morant included witnesses who did not testify in the Lewis case and a statement that Morant gave to the police that was not and could not have been introduced against Mr. Lewis. Moreover, Judge Blue did not consider a *Brady* claim; rather Morant argued that newly discovered evidence warranted a new trial. Indeed, Judge Blue noted that Ruiz did not enjoy the "exalted status" of "key witness" in the Morant case that the Connecticut Supreme Court had accorded to him in the Lewis case (A-118).

The District Court conducted a detailed and careful review of certain aspects of Judge Blue's decision and its relevance to the Lewis habeas decision (Zoarski, J.) as part of its analysis of the *Brady* claim under 28 U.S.C. §2254(d) (A-10 thru A-17).

---

[8] Indeed, the State acknowledges that the Morant hearing "was in the context of a completely different legal claim, encompassing a different set of legal and factual elements." (Resp.Br. 43.)

### b. Federal Procedural History

Mr. Lewis filed a *pro se* federal habeas petition on January 29, 2003 that alleged three claims: (1) that the State had withheld material exculpatory and impeachment evidence ("the *Brady* claim"); (2) that the State had knowingly presented perjurious testimony by Ovil Ruiz ("the perjury claim"); and (3) that the State had unconstitutionally suppressed evidence of third party culpability ("the third party culpability claim"). The State filed an Answer to the petition on July 31, 2003 and a supporting memorandum of law asserting, inter alia, procedural objections to the *Brady* claim (ECF Nos. 14 & 15). After ordering supplemental briefing in 2006, the district court (Chatigny, J.) appointed counsel to represent Mr. Lewis (ECF No. 58) on November 14, 2009, and requested additional briefing on the procedural issues. Following judicial reassignment, Judge Haight heard oral argument on October 26, 2011 (S.A.135).[9] On February 23, 2012, the court issued a written ruling holding that the *Brady* claim was not procedurally barred but finding that the perjury claim had been procedurally defaulted (A-157 thru 173).

On April 16, 2012, pursuant to the court's order, Mr. Lewis filed a Motion for Leave to Amend the Petition attaching an Amended Petition that included the

---

[9] It became clear during oral argument that the court file did not contain documents that had been filed previously and cited by Mr. Lewis' counsel. An updated version of the original briefing was filed with a supporting appendix that contained all cited documents on January 18, 2012 (ECF No. 110).

perjury claim (ECF No. 127). On April 17, 2012, Mr. Lewis also filed a Motion to Proceed to an Evidentiary Hearing on Procedurally Defaulted Perjury Claim (ECF No. 131) with supporting memorandum (ECF No. 143-3) arguing that the Court could reach the merits of his perjury claim, despite its finding of procedural default, under the actual innocence gateway standard set forth in *Schlup v. Delo*, 513 U.S. 298 (1995) and confirmed in *House v. Bell*, 547 U.S. 518 (2006) (ECF No. 143-3).

On February 19, 2013, the Court granted the Petitioner's Motion for Leave to Amend (ECF No. 171) and ordered an evidentiary hearing on the *Brady* and third-party culpability claims (ECF No. 172). Mr. Lewis filed his Corrected Amended Petition on the same date (S.A.1-120). The district court held an eight-day evidentiary hearing in June, 2013. The parties filed subsequent briefs and presented extensive oral argument (ECF Nos. 276 & 277).

On December 16, 2013, the court issued a ruling granting the petition (A-1 thru A-68) and ordering the State to release Mr. Lewis from custody within sixty days unless the State declared its written intention to retry him (A-68). By letter dated February 14, 2014, the State advised that it would not retry Mr. Lewis (S.A. 139). Based on a joint motion submitted by the parties, the Court signed a writ ordering Mr. Lewis' release (S.A. 140-144).

# SUMMARY OF THE ARGUMENT

After almost nineteen years of wrongful incarceration, the District Court recognized that the State violated its obligations under *Brady v. Maryland* and deprived Mr. Lewis of a constitutionally fair trial. Misled by police and prosecutorial malfeasance, the state habeas trial court applied an erroneous legal standard and ignored unrefuted evidence that the principal witness had repeatedly denied personal knowledge of the crime. The state ruling that *Brady* requires "due diligence" was contrary to clearly established law and warranted relief under 28 U.S.C. §2254(d)(1). The state court's decision that all exculpatory information had been furnished to the defense was an unreasonable application of governing law to the testimony of Michael Sweeney and entitled Mr. Lewis to federal review under 28 U.S.C. §2254(d)(2).

The state appellate court was also misled by the State into concluding that a *Brady* claim had not been litigated in the trial court. There is no firmly established and regularly followed state procedural rule that requires an appellant to provide an entire trial transcript. Acting *pro se*, Mr. Lewis provided an adequate appellate record that included all relevant transcripts – the testimony of Michael Sweeney and the Lewis criminal trial transcript. Mr. Lewis also met the threshold habeas requirement of establishing that his claim was not frivolous by presenting

detailed analysis of the legal and factual elements necessary to demonstrate his *Brady* claim.

## ARGUMENT

### I. The District Court Correctly Rejected the State's Claim that Mr. Lewis Had Procedurally Defaulted His *Brady* Claim.

The State renews its claim that Mr. Lewis procedurally defaulted his *Brady* claim by failing to abide by independent and adequate state procedural rules (Resp. Br. 18-37). The District Court carefully considered each of these arguments and properly rejected them as meritless (A-164-167, 169-172).

#### A. Standard of Review and Governing Law

A state court's rejection of a federal claim on procedural grounds will bar federal review only "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). "[T]he adequacy of state procedural bars to the assertion of federal questions is itself a federal question." *Douglas v. Alabama,* 380 U.S. 415, 422 (1965). The Court reviews *de novo* the "issue of whether the procedural ground is 'adequate' to support the judgment." *Monroe v. Kuhlman*, 433 F.3d 236, 240 (2d Cir. 2006).

For a state procedural rule to be adequate to bar federal review of a constitutional claim, it must meet several requirements. First, the highest state court to provide a reasoned decision on a federal claim must have "clearly and

expressly state[d] that its judgment rests on a state procedural bar." *Coleman v. Thompson*, 501 U.S. at 735-736 (*quoting Harris v. Reed*, 489 U.S. 255, 263 (1989) (internal quotation marks omitted)); *Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005). Second, "only a firmly established and regularly followed state practice may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v.Georgia*, 498 U.S. 411, 423–24 (1991) (internal quotation marks omitted). Finally, even a rule that is firmly established and regularly followed will not be an adequate ground to bar federal review where "exorbitant application . . . renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376 (2002) (internal citations omitted).

 *Lee* sets forth three inquiries to evaluate whether a procedural rule has been applied exorbitantly such that it does not constitute an adequate ground to bar federal review:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision;

> (2) whether state case law indicated that compliance with the rule was demanded in the specific circumstances presented; and

> (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir. 2003) (citing *Lee*, 534 U.S. at 381–

85). These *Lee* inquiries are not a "'test' for determining adequacy, [but courts] use

them as guideposts in 'evaluat[ing] the state interest in a procedural rule against the

circumstances of a particular case.'" *Id*. Thus, even if only one of these factors

weighs in favor of Mr. Lewis, that may be sufficient to hold the procedural rule

inadequate to bar federal review. *See Monroe v. Kuhlman*, 433 F.3d at 245

(holding state procedural rule inadequate though only one of *Lee* guideposts

supported petitioner).

> **B. The District Court Properly Ruled that Mr. Lewis Did Not Default His *Brady* Claim When He Chose to Rely on the Testimony of Michael Sweeney and the Transcripts of His Criminal Trial.**

Mr. Lewis reasonably believed he was complying with state procedural rules

when he chose not to request and file the transcript of his habeas trial proceedings.

The rules do not specify that any particular document must be included in the

record; instead, they require an appellant to provide a record adequate for review

of any claimed impropriety by the trial court. *See* Connecticut Practice Book

(*"P.B."*) §§ 60-5, 61-10.[10] Because the habeas trial court had discussed only

documentary evidence—including the transcribed testimony of central witness

---

[10] The relevant provisions of the Connecticut Practice Book are in the Supplemental Appendix.

15

Sweeney—in ruling on Mr. Lewis' *Brady* claims, Mr. Lewis reasonably believed that only the documentary evidence would be necessary for review of this claim.

The State argues (Resp. Br. 20-28) that Mr. Lewis failed to comply with the adequate record rule by failing to file a complete transcript of the habeas trial. Ignoring the District Court's careful parsing of the record (A-165), the State first asserts that the Connecticut Appellate Court clearly and expressly relied on the adequate record rule to dismiss the appeal (Resp. Br. 20). Rather than applying the relevant test for determining whether a state procedural rule is adequate to bar federal review, the State then argues inapposite state cases and an irrelevant rule of federal appellate procedure (Resp. Br. 22-23). This argument distorts the habeas court decision and the record below.

The District Court correctly ruled: (1) that the appellate court did not clearly and expressly state a rule that would bar review of the *Brady* claim, and; (2) that the State had failed to demonstrate that a "firmly established and regularly followed" adequate record rule required habeas petitioners to provide a full habeas trial transcript on appeal (A-167-69).

First, since the Appellate Court ignored Mr. Lewis' *Brady* claims due to the State's misrepresentations, and nowhere mentioned any deficiency in the record on appeal as a basis for declining to review those claims, the State has not demonstrated that the appellate court clearly and expressly relied upon a

16

procedural rule in dismissing Mr. Lewis' *Brady* claim. Second, the State has not sufficiently demonstrated that a rule on transcript filing was firmly established and regularly followed, as required by *Ford*, 498 U.S. at 423–424. Finally, the application of the rule in Mr. Lewis' case would be exorbitant under *Lee* and *Cotto*.

    1.  The State Misled the Connecticut Appellate Court About Litigation of the *Brady* Claim and About the Record in the Habeas Trial Court.

On appeal, Mr. Lewis specifically argued that the habeas trial court had erred in holding that the information possessed by Sweeney was not favorable and that it incorrectly concluded that this information had not been suppressed by the State in violation of *Brady*.[11] (S.A. 296, 299).  Rather than respond to the merits of Mr. Lewis' claims, the State misled the Appellate Court into believing that Mr. Lewis had not litigated his *Brady* claim below and raised a series of procedural arguments. The State also made two serious misrepresentations.

First, the State appellate counsel represented "as an officer of the court" that a transcript would reveal that the only issue decided by the habeas court was whether the content of the Sweeney testimony constituted newly discovered evidence (S.A. 381 & n.6) ("[T]he issues [petitioner] has raised on appeal were not

---

[11] The fact that Mr. Lewis attached the habeas court's decision to his brief and the reference to *State v. McIntyre*, 242 Conn. 318, 323 (1997) (articulating *Brady* standard) therein demonstrates that the appellate court should have been aware of the *Brady* claim. (A-74.)

litigated in or decided by the habeas court. . . . The habeas court ruled only that the petitioner had failed to prove that the substance of Sweeney's 1999 testimony in Morant's petition for a new trial before Judge Blue was not [sic] newly discovered evidence.").

In his reply brief, Mr. Lewis explained that the *Brady* claim had in fact been litigated (S.A. 394-405). Despite Mr. Lewis' best efforts to alert the Appellate Court to his *Brady* claims, that court accepted the State's misleading argument, did not address the *Brady* claim, and focused only on the newly discovered evidence claim. *Lewis v. Comm'r of Corr.*, 73 Conn.App. 597, 597 (2002)(characterizing the issues on appeal as whether the court acted improperly (1) in concluding that the Sweeney testimony did not constitute newly discovered evidence and (2) in failing to draw an adverse inference when witness, Ovil Ruiz, invoked his Fifth Amendment privilege). The District Court found both that Mr. Lewis had raised the *Brady* issue on appeal and that the State's appellate brief was misleading in suggesting that he had not (A-165).

Compounding its earlier misrepresentations, the State also incorrectly represented that the transcript of Mr. Lewis' criminal trial had not been filed as an exhibit before the habeas trial court (S.A. 379, n.3) (asserting that, in his statement certifying that no transcript was deemed necessary for inclusion, "the petitioner declared his intention to rely on certain exhibits in the habeas court, as well as the

18

transcript of 'the criminal trial of the [petitioner],' which was not offered as an exhibit in the habeas court"). The criminal transcript was entered into evidence in the habeas trial court as a full exhibit, as the State now admits (*See* ECF No. 75).

The Appellate Court's ruling is not adequate to bar review of Mr. Lewis' *Brady* claim. The opinion ignored Mr. Lewis' *Brady* claims entirely, apparently because the court accepted the State's misleading argument as truth. *See Lewis,* 73 Conn.App. at 597. Since the Appellate Court entirely overlooked Mr. Lewis' *Brady* claims, it cannot have had a reasoned basis, procedural or substantive, for dismissing those claims. For these reasons, the District Court was correct in holding that Mr. Lewis had not procedurally defaulted his *Brady* claims.

2. <u>The State Has Failed to Demonstrate That a Firmly Established Connecticut Adequate Record Rule Required Mr. Lewis to File the Habeas Court Transcripts.</u>

In addition to concluding that the Appellate Court did not "clearly and expressly" apply the adequate record rule with respect to the *Brady* claim (A-167), the District Court also ruled that the State had failed to establish that the adequate record rule was "firmly established and regularly followed" (*Id*). The District Court properly noted that Connecticut Rules of Appellate Procedure 61-10 and 63-8 make an appellant responsible for providing an adequate record for review and require him to file those parts of the transcript of the trial court proceeding that he deems necessary for review. (A-164-165). Mr. Lewis clearly raised the *Brady*

issue on appeal (A-165) and provided the transcripts necessary to review that claim.

Reversing the position it took in the Connecticut Appellate Court, that Mr. Lewis had litigated only a newly discovered evidence claim in the trial court, the State now argues that Mr. Lewis "eclipsed the opportunity" for comprehensive review of his *Brady* claim by failing to provide the complete transcript of the habeas trial (Resp. Br. 21).

Mr. Lewis provided an adequate record for review of his *Brady* claim. He provided the full testimony of Michael Sweeney from the Morant proceedings, prior recorded testimony that the parties agreed could be entered into evidence as a documentary exhibit. He also provided the full transcripts of his criminal trial and the transcripts of his probable cause hearing, all of which had also been entered into evidence as documentary exhibits during his habeas proceeding. These transcripts constituted an adequate record for review.

The State has never argued that anything from the habeas transcript would have been relevant to the trial court's determination of the *Brady* claim. Nor can it. On its face, the Sweeney testimony provided clear evidence that the State had failed to disclose favorable exculpatory and impeachment evidence. The State called no witnesses and offered no exhibits during the state habeas trial.

The State prefaces its adequate record argument by misapplying the standard for evaluating a *Brady* claim (Resp. Br. 21). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)).[12]  A showing of materiality does not require demonstration that disclosure of the suppressed evidence would have resulted in a defendant's acquittal.  *Id*. at 434.  Rather, a fair trial is "understood as a trial resulting in a verdict worthy of confidence." *Id*. Materiality is not a sufficiency of the evidence test.  "The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict." *Id*. at 435.

Although the State acknowledges the *Kyles/Bagley* standard, it cites a string of inapposite cases in support of its broad assertion that the Connecticut adequate record rule requires an appellant to provide specific transcripts (Resp. Br. 22).

---

[12] The State cites *Cone v. Bell*, 556 U.S. 449 (2009) for a similar proposition. After tracing the shifting and inconsistent representations made by the State of Tennessee in that litigation, Justice Stevens noted: "The State's procedural objections to federal review of the merits of Cone's [*Brady*] claim have resulted in a significant delay in bringing this unusually protracted case to a conclusion." *Id*. at 469. The record in this case supports a similar conclusion.

Only three of those cases pre-date the decision in Mr. Lewis' state habeas case[13]

and each of them considered rules that disappeared in the 1997 overhaul of the

Connecticut Practice Book (S.A. 496-497).[14] Moreover, each of those cases

considered a challenge to sufficiency of the evidence, which involves an entirely

different and more demanding level of review than that required to demonstrate

*Brady* materiality. *Kyles,* 514 U.S. at 435. The State does not cite a single case that

either discussed a *Brady* claim or that required a full transcript in a habeas appeal

challenging a criminal conviction.[15]

---

[13] *McGaffin v. Roberts*, 193 Conn.App. 393, 409 (1984) (considering record necessary to consider sufficiency of evidence in a habeas corpus child custody case under P.B. §§3060F and 3060V); *Pleines v. Franklin Constr. Co..*, 30 Conn.App. 612, 615 (1993) (citing *McGaffin* in challenge to judgment of foreclosure by sale of a mechanic's lien on insufficiency of the evidence grounds); *In re Lea T.*, 15 Conn.App. 455, 457 (1988) (challenging sufficiency of the evidence in parental termination case).

[14] Even under these earlier rules, evidentiary issues were reviewed without full transcripts. *Sanderson v. Steve Snyder Enters., Inc.*, 196 Conn. 134, 138 n.2 (1985).

[15] The State cites: *O'Halpin v. O'Halpin*, 144 Conn.App. 671, 675-76 (2013) (court refused to address alleged discovery non-compliance during trial without the relevant transcript); *State v. Germain*, 142 Conn.App. 805, 807-08 (2013) (insufficiency of evidence and other claims unreviewable in the appeal of a motor vehicle infraction); *Perez v. D & L Tractor Trailer Sch.*, 117 Conn.App. 680, 691 (2009) (finding an evidentiary claim unreviewable when the appellant failed to provide a transcript of the challenged evidentiary ruling); *Calo-Turner v. Turner*, 83 Conn.App. 53, 56 (2004) (sufficiency of evidence challenge to finding that parties were equally at fault in the breakdown of a marriage could not be reviewed).

Curiously, the State also relies on a "nearly identical" *federal* rule, and federal cases discussing that rule, to support its argument that an independent and adequate *state* procedural rule barred federal review of Mr. Lewis' *Brady* claim. (Resp. Br. 23-24). This authority does not establish that Connecticut had a firmly established rule requiring that habeas appellants provide full habeas trial transcripts in order to obtain review of a *Brady* claim.[16]

3. Requiring Mr. Lewis to Provide a Full Habeas Trial Transcript Would Constitute an Exorbitant Application of the Adequate Record Rule.

The State conceded at oral argument on this issue that Connecticut has no absolute rule requiring a petitioner to provide the full habeas trial transcript on appeal, as the following colloquy demonstrates:

> THE COURT:    He's the master, the Petitioner, of what the adequate record should be, and is it your position that where trial is there, the Petitioner must always include and present to the habeas court, the full trial transcript, or rather, is that not an absolute rule and, to a certain degree, the Petitioner can either put

---

[16] In *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000), this Court applied FRAP 10(b)(1) to find a challenge to the sufficiency of the evidence unreviewable. Cases from other circuits are similarly inapposite. *McGinnis v. Gustafson*, 978 F.2d 1199, 1201 (10th Cir. 1992) (interpreting Tenth Circuit General Order to bar review of a summary judgment ruling); *Richardson v. Henry*, 902 F.2d 414, 416 (5th Cir. 1990) (sufficiency of evidence claim in a civil rights case unreviewable without a transcript); *Southwest Adm'rss, Inc. v. Lopez*, 781 F.2d 1378, 1380 (9th Cir. 1986) (union trust fund appeal dismissed for failure to comply with FRAP 10(b)(2) and Local Ninth Circuit Rule 19); *Brattrud v. Town of Exline*, 628 F.2d 1098, 1099 (8th Cir. 1980) (property condemnation appeal dismissed for failure to comply with FRAP 10(b) or 10(c)).

23

part of the trial record into the record, or none of
it, as was the case with Mr. Lewis?

What I'm trying to understand is in your view
of Connecticut law, and regulations, and practice, and
custom and so forth, in a circumstance like that, must
the Petitioner always put the entire trial record into
the habeas application?

MS. SULIK:       Not always.

THE COURT:       Not always.

MS. SULIK:       No. As with anything, it's going
to sort of depend on the circumstances and the claims
being made.

THE COURT:       Yes. Okay.

(S.A. 136-37). This testimony clarifies that barring federal review would

constitute an exorbitant application of the adequate record rule. *Cotto*, 331 F.3d at

240. By providing all transcripts relevant to the *Brady* claim -- the Sweeney

testimony and the criminal trial -- Mr. Lewis "substantially complied" with the

adequate record rule, particularly given "the realities of the trial" where Michael

Sweeney was unavailable to provide live testimony.

### 4. Mr. Lewis Provided All Transcripts Necessary to Resolve His *Brady* Claim on Appeal.

The state habeas court prefaced its ruling that Mr. Lewis had "failed to

sustain the heavy burden to establish 'that the prosecution suppressed evidence'"

with the  statement "not only was all exculpatory evidence furnished to the

24

defense, but also the alleged evidence was available by due diligence to the defense." (A-74). The District Court determined that the habeas court had incorrectly incorporated a "due diligence" requirement into its *Brady* analysis and that the Appellate Court could have reviewed that ruling without transcripts (A-166-167).[17]

Eliding the fact that it misled the appellate court into concluding that the *Brady* claim had not been litigated below, the State makes three arguments in support of its effort to validate the state habeas court ruling: (1) a "fair reading" of the habeas court opinion shows that it did apply the appropriate *Brady* standard; (2) even if the legal ruling was incorrect, the appellate court was required to review the record "to determine if *Brady* was *substantively* misapplied"; and (3) the "primary ground" of the habeas court's opinion, that the Sweeney information was not exculpatory, required a more complete record (Resp. Br. 24). Each of these arguments is meritless.

The State does not argue that a defendant must demonstrate "due diligence" in order to establish a *Brady* violation. Rather it asserts that the due diligence language in the habeas court decision was directed to a claim of actual innocence (Resp. Br. 25). This assertion mischaracterizes both the record and the habeas court decision.

---

[17] In *Birchler v. Gehl Co.*, 88 F.3d 518, 520 (7th Cir. 1996), cited by the State, the Seventh Circuit arrived at a similar conclusion in a products liability case.

As described by the state habeas court, the amended petition Mr. Lewis filed *pro se* on January 9, 2001 alleged three claims: (1) newly discovered evidence (that Ruiz gave perjurious testimony); (2) failure to disclose exculpatory evidence; and (3) newly discovered evidence of alibi testimony (actual innocence) (A-72).

Count Two of the petition clearly alleged that "[t]he State's Attorney failed to disclose exculpatory/impeachment evidence to the defense" (A-131). It had four separate parts. In the first section, Mr. Lewis described the State's failure to disclose material about Ovil Ruiz's involvement in the Javier Torres shooting investigation (A-131-133).[18] The second part of the petition described non-disclosure of a statement Ovil Ruiz allegedly gave during the Jacqueline Shaw murder investigation (A-133-134). In the third section, Mr. Lewis alleged facts concerning the non-disclosure of the information possessed by Michael Sweeney (A-134-136). In the fourth part, Mr. Lewis alleged that the State presented perjured testimony by Ovil Ruiz about his criminal convictions (A-136-137).[19]

Judge Zoarksi recognized that Count Two "alleges that the State's Attorney failed to disclose exculpatory evidence" and he described the allegations in some detail (A-73-74). He did not mention newly discovered evidence or actual

---

[18] The District Court considered this claim (A-51-53) and found that "a police perception of Ruiz as a source prone to lying has obvious impeachment value within the context of the Lewis trial" (A-53).

[19] Judge Zoarski apparently overlooked the fourth part of Count Two and referred to the Michael Sweeney information as the "final claim" in this count.

innocence until he addressed Count Three (A-74). Ignoring Judge Zoarski's explication of the state habeas petition, the State focuses on language that appears at the beginning of Count Three of the petition (A-138). The State's attenuated argument that the "due diligence" language in the habeas court decision was directed at the actual innocence claim does not withstand scrutiny.

The State next briefly asserts, for the first time, that Mr. Lewis should have filed a Motion for Articulation with the habeas trial court (Resp. Br. 26). The habeas court decision was not unclear.[20] To the degree that it is unclear whether the Appellate Court decision addressed the *Brady* issue, the State created that problem, a problem that would not have been remedied by articulation in the trial court.

Finally, the State argues that even an erroneous state ruling on the *Brady* standard could not provide the sole basis for reversal (Resp. Br. 27-28). This argument is primarily based on law governing patent litigation and is entirely inapposite to the constitutional analysis required here.[21] In this case, the erroneous

---

[20] The appellate court also had the authority to request further articulation (P.B. § 60-5; S.A. 389).

[21] Indeed, in *Fromson v. Advance Offset Plate, Inc.*, the court ultimately decided that the lower court ruling was premised on a "basic error of law" that required reversal. 755 F.2d 1549, 1556-58 (Fed. Cir. 1985). The language quoted from *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983) appears in a technical discussion of the role that the procedural presumption of patent validity plays in patent litigation.

assumption that a defendant's due diligence is relevant to the legal analysis

infected the substantive finding that there had been no *Brady* violation.

### C. The District Court Correctly Ruled that Mr. Lewis Adequately Briefed the Certification Issue.

The State also argues (Resp. Br. 29-37) that Mr. Lewis procedurally

defaulted his *Brady* claim by failing to brief that it was an abuse of discretion to

deny him certification to appeal the habeas court decision. As the District Court

explained (A-169-172), Mr. Lewis complied with Connecticut procedures that

require appellants to make a showing that their uncertified appeal is not frivolous.

Once again relying on inapposite federal authority, the State ignores the fact that

Mr. Lewis amply briefed arguments that he had satisfied the criteria for

establishing an abuse of discretion set forth in *Lozada v. Deeds*, 498 U.S. 430, 431-

32 (1991) and affirmed by the Connecticut Supreme Court in *Taylor v. Comm'r of

Correc.*, 284 Conn. 433, 448 (2007).

#### 1. Mr. Lewis Complied with State Procedural Requirements by Briefing the Denial of Certification.

After the state habeas trial court dismissed his petition, Mr. Lewis petitioned

for certification to appeal, pursuant to Connecticut Practice Book § 80-1. (S.A.

281.) Justice Katz denied him certification without a written opinion or rationale.

(S.A. 282.) Mr. Lewis then appealed to the Connecticut Appellate Court,

specifically characterizing his appeal as one regarding "den[ial of] certification"

28

(S.A. 283) and discussing in his briefing why his claims merited further review (S.A. 287-307).

The Connecticut Supreme Court has held that in order to prove that it was an abuse of discretion to deny certification, a habeas petitioner may demonstrate any one of the three criteria identified in *Lozada v. Deeds,* 498 U.S. at 431–32: "[1] that the issues are debatable among jurists of reason; [2] that a court could resolve the issues in a different manner; or [3] that the questions are adequate to deserve encouragement to proceed further." *Simms v. Warden*, 230 Conn. 608, 612 (Conn. 1994) (citing *Lozada*). In other words, the petitioner must show that there is debate, uncertainty or some other significant question surrounding the claims underlying his appeal—a showing that necessarily involves a discussion of the substantive claims for which appeal is sought. *Castonguay v. Commissioner of Correction,* 300 Conn. 649, 657–58 (2011) (*quoting Taylor v. Comm'r of Corr.*, 284 Conn. 443, 449(2007)).

*Taylor* is instructive. After noting that certification was intended to deter frivolous habeas appeals and identifying the *Lozada* factors (*id.* at 448), the court described the relationship between merits analysis and abuse of discretion review. *Id*. at 449 ("In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court

29

reasonably determined that the petitioner's appeal was frivolous.") The court then analyzed the merits of the petition in detail (*id.* at 449-452) before returning to the merits of respondent's claim that the habeas court acted reasonably in denying certification (*id*. 452-455).[22]

Mr. Lewis demonstrated an abuse of discretion by explaining that his substantive claims were not frivolous. Consistent with the first two *Lozada* criteria, that the issues were debatable by reasonable jurists, or that a court could have resolved the issues differently, Mr. Lewis outlined errors made by the habeas court in its *Brady* ruling. In his opening brief, Mr. Lewis identified the *Brady* issue and relevant federal authority (S.A. 289, 293, 297, 299-302), succinctly stated that the "habeas court had applied the wrong standard of review" (S.A. 296), attached relevant Sweeney transcript excerpts as an appendix and gave a detailed analysis of the exculpatory and impeachment evidence, and its non-disclosure (S.A. 295-296, 299, 300 n.7). In his reply brief, Mr. Lewis satisfied *Lozada*'s third criterion, that his claims were adequate to deserve encouragement to proceed. Asserting that the State had ignored his *Brady* claim, Mr. Lewis emphasized the centrality of Sweeney's testimony to Ruiz's credibility and provided specific citations to demonstrate the conflict between Ruiz's trial testimony and the Sweeney evidence.

---

[22] The court engaged in this analysis despite the fact that petitioner's counsel had not briefed denial of certification.

He thus described, with specificity rather than mere assertion, how the State had violated his due process rights under the federal constitution. (S.A. 400-402.)

In applying the *Lozada* standard, a court must "review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria[.]" *Taylor*, 284 Conn. at 448. By briefing the merits of his *Brady* claim in detail, Mr. Lewis provided the court with a basis to determine whether the *Lozada* criteria had been met, and whether denial of certification was an abuse of discretion.

Although the state appellate court was aware of the applicable *Simms*/*Lozada* standard of review, it failed to consider the merits of Mr. Lewis' *Brady* claim. *Lewis v. Comm'r of Corr.,* 73 Conn.App. at 599. By providing detailed legal and factual arguments in both his opening and reply briefs, Mr. Lewis demonstrated that his claims were not frivolous and that the one-word denial of certification constituted an abuse of discretion. The District Court properly construed his *pro se* arguments to satisfy the *Lozada* standard.[23] (A-171-72.)

---

[23] This Court has repeatedly accorded liberal construction to pleadings and appellate briefs of *pro se* prisoners. *See e.g., Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 475-476 (2d Cir. 2006); *Coulthurst v. United States,* 214 F.3d 106, 109 (2d Cir.2000).

2.  <u>The Certification Briefing Requirement is Not an Independent and Adequate State Ground.</u>

Even if this Court concludes that Mr. Lewis did not substantially comply with the purported certification briefing requirement, the State has failed to establish that it is an independent and adequate rule sufficient to bar federal review. The evaluation of the independence and adequacy of the state law rests squarely with this Court. *Coleman v. Thompson,* 501 U.S. at 729; *Douglas v. Alabama,* 380 U.S. at 422.

### a. The State does not articulate a clear standard that Mr. Lewis allegedly failed to meet.

The State argues that Mr. Lewis did not adequately brief the abuse of discretion but fails to provide any authority identifying the contours of "adequate" briefing. The only relevant cases the State cites are *Simms* and *Reddick v. Comm'r of Corr.*, 51 Conn.App. 474 (1999), both of which outline how petitioners can demonstrate an abuse of discretion.

The *Reddick* court articulated the uncontroversial proposition that mere assertion of a constitutional violation does not *prove* an abuse of discretion under the *Simms/Lozada* test. *Reddick*, 51 Conn.App. at 477. It did not outline or discuss the level of briefing that is adequate to avoid procedural default. As described above, Mr. Lewis satisfied the requirements of *Reddick* and the *Simms/Lozada* test, as amplified by *Taylor*, by explaining both in his opening and reply briefs that his

federal constitutional claim was supported by precedent and by documentary evidence presented during the state habeas trial.

Because the State has not even articulated a rule, such a rule is not "firmly established" or "regularly followed" and certainly cannot be an independent and adequate ground sufficient to bar federal review. Given the State's inability to provide definition and evidence for the asserted adequate briefing rule, this Court also cannot consider the *Lee* guideposts for evaluating the state interest in a procedural rule against the circumstances of a particular case. *See* Section I.A., *supra*.

### b. The State has failed to establish that the rule it asserts was "firmly established" and "regularly followed."

Fundamental to any evaluation of the independence and adequacy of the state procedural rule is a finding that the underlying rule was "firmly established" and "regularly followed." *Garvey v. Duncan*, 485 F.3d 709, 711 (2d Cir. 2007). As discussed above, the State has failed to define a rule on adequate briefing; thus it could not have been firmly established and regularly followed.

The Connecticut Appellate Court demonstrated recently that it can and does request supplemental briefing on whether denial of certification constituted an abuse of discretion, when it concludes that specific briefing would be helpful. *See Hankerson v. Comm'r of Corr.,* 150 Conn.App. 362 (2014).  A rule requiring

dismissal in the absence of briefing certification is not, therefore, "clearly established and regularly followed."

Respondent cites (Resp. Br. 29) *State v. Gaines*, 36 Conn.App. 454, 460 (1994) for the unremarkable proposition that an issue that is not adequately briefed will not be addressed on appellate review. *Gaines* is a direct appeal and therefore does not discuss denial of certification or whether abuse of discretion must be briefed in a particular manner to avoid procedural default.

Instead of arguing that Connecticut has an independent and adequate rule, the State relies heavily on the inapposite *federal* procedure for filing a habeas appeal. Admitting, as it must, that "[u]nlike the federal mechanism, certification in Connecticut is not jurisdictional" (Resp. Br. 31), the State nonetheless relies extensively on federal precedent construing the federal requirement (Resp. Br. 30-34, 36).

The State concedes that Connecticut courts "necessarily must *consider the merits* of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Resp. Br. 33, *quoting Taylor v. Comm'r of Corr.*, 284 Conn. at 449.) In fact, the State cites cases that do precisely that. In both *Tutson v. Comm'r of Corr.*, 144 Conn.App. 203 (2013) and *Jefferson v. Comm'r of Corr.*, 144 Conn.App. 767 (2013), the Connecticut Appellate Court sets forth the *Simms* factors, notes the teaching of

34

*Taylor* -- that the standard requires review of the merits -- and then conducts a merits review.[24]

Mischaracterizing the District Court's decision as mandating a full merits review, the State retreats again to arguing federal precedent and asserts that principles of comity require reversal. (Resp. Br. 35-37.)  As explained above, Connecticut precedent requires courts to consider the merits of a habeas appeal in determining whether it was an abuse of discretion to deny certification.  The District Court required nothing more.

### D. Even If This Court Finds Procedural Default, It Should Remand for an Evidentiary Hearing on Actual Innocence.

In *Schlup v. Delo,* 513 U.S. 298 (1995), the Supreme Court held that a credible claim of actual innocence enables federal habeas courts to review the merits of federal constitutional claims that are otherwise procedurally barred. *Id.* at 316 (holding that the actual innocence claim functions as a "gateway" to merits review of procedurally barred claims). Mr. Lewis filed a *Schlup* motion so that his perjury claim could be heard on the merits, and the District Court deferred a merits hearing on that claim.  Although the State arguments lack merit, if this Court finds

---

[24] *Tatem v. Comm'r of Correc.*, 39 Conn.App. 813 (1995), and *Slack v. McDaniel*, 529 U.S. 473 (2000), simply establish that merits review is not required of claims that were not presented or briefed below. As the State now acknowledges, Mr. Lewis raised his *Brady* claim both in the court below and in his petition for certification.

the *Brady* claim to be defaulted, it should remand the case for a *Schlup* hearing on both claims.

### 1. The *Schlup*/*House* Standard

*Schlup* instructs habeas courts to assess the credibility of a petitioner's actual innocence claim by first determining whether a petitioner puts forth new and reliable evidence in support of the claim. *Id.* at 324. Once a court determines that a petitioner's evidence is new and reliable, it must consider the actual innocence claim in light of the evidence in the record as a whole, including evidence that may have been inadmissible or wrongly excluded at trial. *Id.* at 327-28; *Rivas v. Fischer* 687 F.3d 514 (2d Cir. 2012) (reviewing evidence from state post-conviction proceedings, *Schlup* evidentiary hearing and taking judicial notice of other sources). If the court determines, in light of *all* the evidence, that petitioner has proven that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," the court must review the merits of petitioner's procedurally barred claims. *Id.* at 327. "[T]he showing of 'more likely than not' imposes a lower burden of proof than the 'clear and convincing' standard required under *Sawyer* [*v. Whitley*, 505 U.S. 333, 336 (1992)]." *Id.* The injustice that results from the conviction of an innocent person "has long been at the core of our criminal justice system" and reflects "the fundamental value

36

determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *Id*. at 325 (internal punctuation and citations omitted).

In *House v. Bell,* 547 U.S. 518 (2006), the Court confirmed that the *Schlup* actual innocence gateway survived the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. §2254. *House* further clarified that a petitioner need not establish "absolute certainty" of innocence in order to pass through the *Schlup* gateway. *Id*. at 538.

2.  Mr. Lewis has Pled and Developed Extensive Evidence of Actual Innocence.

The disturbing undercurrent of the State's arguments is the unstated assumption that Vincent Raucci was a professional detective who interviewed Ovil Ruiz using appropriate police protocol. Extensive evidence demonstrates Raucci was a deeply troubled and unscrupulous person, with ties to the Fair Haven drug trade, who threatened and coerced vulnerable young people to make statements against Mr. Lewis.[25]

---

[25] At least one court has already recognized Raucci's outrageous interview behavior in another case. *See State v. Horrocks*, 57 Conn.App. 32, 34-35 (2000) (reversing a rape conviction and discussing evidence that Raucci had "wild sex" with the alleged victim hours after her reported rape).

The Corrected Amended Petition and the five-volume supporting Appendix[26] offer a detailed description of the exculpatory evidence known to Mr. Lewis in April 2012. Witness testimony and exhibits submitted during the federal evidentiary hearing substantiated and corroborated Mr. Lewis' claim of actual innocence.[27] A complete inventory of actual innocence evidence is premature but the summary below provides an adequate basis for remand, should this Court find the *Brady* claim to have been procedurally defaulted.

### a. The Maher Investigation Focuses on Michael Cardwell.

NHPD Detective Vaughn Maher was the lead investigator on the Turner-Fields homicide for three months, October, 1990 - January, 1990. Under his direction, the NHPD investigated many individuals involved with Turner's drug operation, and pursued promising leads regarding a suspect named Michael Cardwell. When Det. Raucci took over the investigation, those leads were abandoned. During the time Det. Maher led the investigation, no evidence pointed to, and not one of the many people interviewed by the police mentioned, Scott Lewis. (S.A. 9-12, 23; ¶¶ 21-28, 67; S.A. 198-199, 213).

---

[26] The appendix, which also supported the motion for a *Schlup* hearing, was filed manually.

[27] Although the District Court did not consider actual innocence, evidence relevant to both the *Brady* and *Chambers* claims is also relevant to the *Schlup*/*House* issues.

Mounting evidence focused on suspect Michael Cardwell (S.A. 16-22, ¶¶ 44-65; S.A. 200-202). Significantly, during the week of November 11, 1990, after seven individuals had already named Michael Cardwell as an associate of Turner and Fields, a known and reliable police informant, now known to be Frank Graham,[28] reported to Det. Maher that Michael Cardwell had confessed to killing Turner and Fields (S.A. 203-210). On December 2, a different registered informant reported to the NHPD that "word on the street" was that "Bullet" (Michael Cardwell's street name) had killed Turner and Fields because of a drug dispute. Det. Maher was able to corroborate the Graham information from other sources and from Turner's personal effects (S.A.210-212).

### b. Vinnie Raucci, Frank Parise and the Fair Haven Drug Trade.

On May 15 and 16, 1995, Mr. Lewis reported to the FBI that federally convicted drug dealer Frank Parise and Raucci had set him up for the Turner-Fields homicide. Interviews with multiple witnesses, including Parise himself, corroborated essential aspects of Mr. Lewis' report. (S.A. 23-27,¶¶ 68-77; S.A. 218, 223-224).

---

[28] Graham's identity and death were disclosed during the Morant trial but the State did not disclose that information to Mr. Lewis and cross-examined on the theory that Graham was available. Details of the State's knowledge of and failure to disclose Graham's identity are set forth in responses to a request for admission (S.A. 262-277).

### c. Raucci Builds a Case Against Mr. Lewis.

In December, 1990, Ruiz had served as an anonymous source for Raucci who was investigating the Javier Torres shooting. When Raucci learned that Ruiz had lied to him about the identity of the shooter, he got an arrest warrant for Ruiz (S.A. 493-495; S.A. 27-30, ¶¶ 80-86). Raucci arrested Ruiz in the Torres shooting case on January 13, 1991 but only interviewed him about the Turner/Fields homicide that evening (S.A. 30, ¶¶ 87-89).

After getting a statement from Ruiz implicating Mr. Lewis, Raucci built the case against Mr. Lewis by coaching and coercing statements from vulnerable young people. In quick succession, Raucci interviewed Jose Roque, Stefon Morant and Hector Ortiz. Each of these "witnesses" has since recanted and has described being coached and coerced by Raucci during interrogation. (S.A. 38-44, ¶¶ 117-140). Ruiz has also recanted his trial testimony to the FBI, in letters to Mr. Lewis, and to investigator Ellen Knight (S.A. 72-74, ¶¶ 232-241). Every witness who gave a statement to the NHPD about Mr. Lewis described Raucci's coercive interview tactics and recanted their police statements during FBI interviews (S.A. 227-231).

Although Ruiz was released on the Torres assault charges, he was rearrested in March, 1991 on multiple criminal charges arising out of an incident in

Woodbridge. Ultimately, he faced a total exposure of almost 60 years on the Torres and Woodbridge criminal charges.[29]

### d. FBI Investigation and Raucci's Escalating Deterioration.

After Mr. Lewis called the FBI in May 1995, the FBI conducted a nineteen-month investigation that substantially corroborated Mr. Lewis' claim of innocence. The FBI interviewed dozens of witnesses, conducted polygraph examinations (including the incriminating polygraph of Frank Parise about his role in setting up innocent men for the double homicide), performed video surveillance, and undertook forensic testing and handwriting analyses (S.A. 64-65, ¶¶ 204-209; S.A. 236-242).

An FBI laboratory analyzed the Roque statement and determined that the tape had been stopped and started repeatedly during his interview (S.A. 234-235, 254-261). FBI handwriting analysts and other investigators corroborated Ruiz's statement that he had written a threatening letter to himself that the State had entered into evidence against Mr. Lewis (S.A. 242-247). The FBI had pursued leads about Michael Cardwell and was not able to rule him out as a suspect. (S.A. 248).

---

[29] Mr. Lewis provided a chart to the District Court detailing this exposure (S.A. 145).

During the FBI investigation, Raucci was charged with second degree larceny as a result of a NHPD Internal Affairs investigation; he resigned from the NHPD in April, 1996 (S.A. 66, ¶¶ 213-214). The FBI uncovered many allegations concerning Raucci's drug-related misconduct, both in his professional and personal capacities. No fewer than eighteen sources attributed some form of malfeasance or corruption to Raucci (*Id.*, ¶ 215).

In August, 1997, after Raucci was arrested by the NHPD following a dispute with his then-wife, he fled. When Raucci was arrested by authorities in New Mexico, the New Haven police instructed that he be set free and explained that the outstanding charges against him did not fit the criteria for extradition. On June 20, 1999, the FBI went to Raucci's trailer in Silver City, New Mexico to arrest him on charges of larceny and domestic abuse, but Raucci had fled. Finally, on July 15, 1999, Raucci was arrested after a four-hour standoff with FBI agents and sheriff's deputies at his mobile home in Silver City. (S.A. 71, ¶¶ 228, 230).

## e.  DNA and Basilicato Photo Identification of Michael Cardwell.

In 2005, the State released all specimens obtained from the crime scene as partial settlement of a DNA motion appeal Mr. Lewis had filed. The DNA test results did not find any trace of Scott Lewis' DNA, confirming that he was not at the crime scene. On June 9, 2005, the State also presented a photo array to Diane Basilicato, a state witness who lived on the same floor as the victims. She readily

42

identified Michael Cardwell as the man she had encountered whistling on Howard Avenue shortly before the homicide[30] (S.A. 82-83, ¶¶ 274-278).

## II. The District Court Correctly Granted Habeas Relief Under 28 U.S.C. §2254(d).

The State argues in the alternative that federal review was not warranted under 28 U.S.C. §2254(d). First, the State tersely asserts (Resp. Br. 39-40) that the District Court erred in finding that the habeas court applied a *Brady* standard that contravenes clearly established law by imposing a "due diligence" requirement on Mr. Lewis. The State offers no legal argument to support this assertion but argues instead that the state habeas judge provided an alternative basis for his ruling when he "reasonably" concluded that the Sweeney material was not exculpatory. As the District Court cogently explained (A-15-16, 18-19), the habeas court decision was contrary to clearly established law and entitled Mr. Lewis to relief under §2254(d)(1). Second, the State argues (Resp. Br. 40-49) that the habeas court reasonably determined that the Sweeney information was not exculpatory. This argument is premised on a tortured reading of one phrase in the state habeas decision and does not withstand scrutiny. The District Court carefully reviewed the state record (A-9-18) before correctly concluding that the habeas court's factual determination "that all exculpatory evidence was furnished to the defense, was

---

[30] That identification corroborated the Frank Graham information.

43

erroneous and unreasonable" and that federal habeas relief was also warranted under §2254(d)(2) (A-18).

### A. The District Court Correctly Ruled that the State Habeas Decision Was Contrary To Clearly Established Law under §2254(d)(1).

The State asserts in one sentence that the "due diligence" language is reasonably interpreted as directed to Mr. Lewis' "actual innocence" claim (Resp. Br. 39). This apparently abandoned argument both distorts the record below, as explained above, *supra* at 25-26, and ignores the clearly established federal law relied on by the District Court in holding that federal habeas relief was warranted under 28 U.S.C. §2254(d)(1).

The Supreme Court has consistently held that the State has an absolute and unconditional obligation to disclose favorable evidence. The obligation extends to information that impeaches the credibility of a State witness, *United States v. Bagley*, 473 U.S. 667, 676-77 (1985); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972), and the State's duty to disclose exists regardless of requests made by the defense. *United States v. Agurs*, 427 U.S. 97, 107 (1976); *Banks v. Dretke,* 540 U.S. 668, 693 (2004). Requiring a habeas petitioner to demonstrate due diligence contravenes *Brady* and its progeny.  In fact, governing precedent lends "no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed," since

44

"[a] rule declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process." *Id*. at 695-96.

The State asserts that the habeas court's "due diligence" language does not contradict clearly established federal law. Implicitly acknowledging that it has no viable argument under 28 U.S.C. §2254(d)(1), the State relies on *Wetzel v Lambert,* ___ U.S. ___, 132 S.Ct. 1195 (2012) to argue that the habeas court provided an alternative and reasonable holding that rendered the "due diligence" language "beside the point" (Resp. Br. 39-40). In *Wetzel*, the Supreme Court granted certiorari, vacated the Third Circuit opinion and remanded the case for further proceedings consistent with its opinion. *Wetzel* does not discuss due diligence or any argument that the decisions below were contrary to clearly established federal law. Rather, the per curiam decision observes that the Third Circuit failed to address aspects of the evidence that the district court had relied on in denying habeas relief. *Id*. at 1198.

The District Court properly ruled that habeas relief was warranted under §2254(d)(1). The State offers nothing to refute the holding that the habeas court decision was contrary to clearly established federal law and that Mr. Lewis was therefore entitled to federal habeas review under §2254(d)(1).

**B. The District Court Correctly Ruled That The State Habeas Court Unreasonably Determined That All Exculpatory Information Had Been Furnished to The Defense Under §2254(d)(2).**

Finally, the State argues (Resp. Br. 40-49) that the habeas court concluded as a "corollary" to its conclusion that "all exculpatory evidence [was] furnished to the defense" that the Sweeney information is not exculpatory.

1. Applicable Law

The District Court identified the highly deferential standard applied to state court factual findings under §2254(d)(2) and §2254(e)(1) (A-5). The "doubly deferential" standard urged by the State is inapposite. Double deference is appropriate in the context of a Sixth Amendment claim of ineffective assistance of counsel where it "gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, ___U.S. ___, 134 S.Ct. 10, 13 (2013). Unlike defense counsel, prosecutors have an affirmative obligation to disclose exculpatory information and their failure to do so is entitled to no deference. The Lewis case presents a paradigmatic example of a state criminal justice system that has "experienced the extreme malfunction for which federal habeas relief is the remedy." *Id.* at 16 (internal quotation marks omitted).

Without certain basic protections, "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence" *Rose v. Clark*, 478 U.S. 570, 577-78 (1972). This paramount objective of the criminal justice system

is achieved only when those responsible for administering the system adhere to their constitutional duties. Connecticut state officials have abjectedly failed in this case. Their "dishonest conduct [and] unwarranted concealment should attract no judicial approbation." *Banks v. Dretke*, 540 U.S. 668, 696 (2004). Habeas corpus "is designed to guard against extreme malfunctions in the state criminal justice systems." *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment). An extreme malfunction has occurred here.

  2. <u>The District Court Correctly Ruled that the Habeas Court's Decision That All Exculpatory Evidence was Furnished to the Defense was Erroneous and Unreasonable.</u>

  The State argues (Resp. Br. 43) that the District Court erred in holding that Mr. Lewis is entitled to a conclusion that Sweeney's account of events on January 13/14, 1991 is credible. In the alternative, relying on a distorted version of the criminal trial, and evidence that was not introduced during that proceeding, the State asserts that the Sweeney evidence does not undermine confidence in the verdict. (Resp. 44-49.)

  It is difficult to imagine more material or effective impeachment evidence than that described by Michael Sweeney.  A twenty-year veteran of the New Haven Police Department, Sweeney testified that Ovil Ruiz, the eventual "key witness" in a double murder case, told him repeatedly that he was not at the scene of the crime and knew nothing about the homicide.  Sergeant Detective Sweeney

47

also observed and repeatedly rebuked interrogating detective Raucci for his

"absolutely inappropriate" coaching of the witness.[31]  Because Ovil Ruiz was the

only witness who testified that Mr. Lewis was at the crime scene, this evidence

would have "put the whole case in such a different light as to undermine

confidence in the verdict." *Cone v. Bell*, 556 U.S. 449, 470 (2009) (quoting *Kyles*

*v. Whitley*, 514 U.S. 419, 435 (1995).

### a. The State Court Record Demonstrates that Michael Sweeney's *Morant* Testimony is Credible.

The District Court carefully considered the Ovil Ruiz criminal trial

testimony and the transcript of Sweeney's testimony before Judge Blue in the

Morant proceeding. Noting that state courts had identified the centrality of Ruiz's

role as a "key witness" in the Lewis trial (*State v. Lewis*,  245 Conn. 779, 782

(1998); *Morant v. State*, 2001 WL 1203354 at *1), the federal court found it useful

to quote from Judge Blue's description of Sweeney's testimony, "particularly in

the absence of direct eyewitness testimony or forensic evidence identifying Lewis

or Morant as the shooter" (A-11-12). Based on its review of the state court

evidence, the District Court found the impeachment value of Sweeney's testimony

about "the crucial hours of January 13-14, 1991" to be "readily apparent." Factors

that bore "directly upon the credibility of the State's key witness at trial" included

---

[31] This evidence would also have corroborated Roque's testimony that Raucci had
coached him during his police statement. See *supra*, p. 6.

testimony about Ruiz's prior inconsistent statements and Raucci's coaching of Ruiz (A-13). Identifying the crux of that testimony, the court succinctly summarized its impact: "Sweeney heard Ruiz deny three times, in the manner of St. Peter in a different context, any knowledge of the Turner-Fields murders, only to emerge, after being closeted with Raucci, as the State's key witness against Lewis and Morant" (A-15).

The District Court specifically restricted its review to the state court record in conducting its §2254(d) analysis and quoted Judge Blue, the only state court judge who had the opportunity to observe and listen to Sweeney (A-11-12, 16). Judge Blue had explicitly found Sweeney to be "a credible witness" and had stated that his testimony established that Ruiz's January 14, 1991 statement "was obtained [by Raucci] under suspicious circumstances" (A-124).

The State asserts (Resp. Br. 43) that the District Court erred in relying on Judge Blue's credibility determination and that Judge Zoarski did not make a credibility finding.[32] This assertion ignores a clear statement by the Connecticut Appellate Court about review of credibility findings made by a trial court and ignores Judge Zoarski's extensive and unchallenged reliance on Sweeney's testimony.

---

[32] Judge Blue's decision of June 5, 2000 was readily available to Judge Zoarski (A-118).

Connecticut courts have repeatedly emphasized the important role personal observation of a witness plays in credibility determinations. The Connecticut Supreme Court has clearly distinguished the difference between personal observation and review of a written record:

> If a witness' credibility may have *any* impact upon the outcome of a case, the trier of fact must determine that individual's credibility in a proper manner through personal observation of the witness. I am still unable to appreciate my colleagues' claim that a fact finder can determine an individual's credibility based upon a reading of a cold transcript.

*F. Woodward Lewis, Jr. v. Statewide Grievance Comm.,* 235 Conn. 693, 708 (1996)(Berdon, Katz and Palmer, JJ. concurring); *State v. Ritrovato*, 85 Conn.App. 575, 602-03 (2004) ("We give deference to the court's findings regarding the credibility of a witness' testimony because it heard and observed that testimony firsthand.").

Given this precedent, Judge Zoarski could not have made an adverse credibility finding about Sweeney.  Indeed, as the District Court observed, there is no indication that the habeas court regarded the Sweeney testimony as anything other than credible (A-16-17).  Focusing exclusively on Sweeney's testimony that Raucci had provided certain facts to Ruiz, the habeas court ignored its own observations and Sweeney's clear testimony that Ruiz denied that he knew

50

anything about the crime. In doing so, the habeas court committed clear factual error.

First, the habeas trial court erred in finding that "all exculpatory evidence [was] furnished to the defense" (A-74). Sweeney's testimony described two private interviews that he had with Ruiz, including an initial 30-minute interview before Raucci arrived at the police station on the night of January 13, 1991 (S.A. 441). Ruiz repeatedly insisted, when speaking privately to Sweeney, that he knew nothing about the Turner-Fields homicides and was not at the scene of the crime (S.A. 442). The testimony described in detail Raucci's inappropriate questioning and coaching of Ruiz, and Sweeney's repeated interventions and admonishments of Raucci in an attempt to elicit a truthful statement from Ruiz (S.A. 443-444). Ruiz's initial statements to Sweeney and Raucci denying knowledge of the crime were exculpatory evidence because these statements directly contradicted the testimony Ruiz gave at Mr. Lewis' trial. None of this information was disclosed to Mr. Lewis prior to or during his criminal trial. The habeas trial court's finding to the contrary – i.e., the finding that "all exculpatory evidence [was] furnished to the defense" – is a clear factual error.

Second, the habeas trial court found, in relevant part:

> [T]the only information Detective Raucci allegedly
> disclosed to Ruiz prior to his statement on January 14,
> 1991, related to an apartment on Howard Avenue; the

51

> color of the buildings and the petitioner's car was a
> BMW. Other insignificant facts were mentioned as part
> of the questioning  technique. The petitioner has failed to
> prove that any critical information was disclosed by
> Detective Raucci . . . .

(A-74). These findings also constitute clear factual errors. The court itself had

noted Sweeney's testimony that Raucci disclosed many facts to Ruiz – not "only"

"an apartment on Howard Avenue; the color of the buildings and the petitioner's

car was a BMW." *Id.* Sweeney testified that Raucci fed Ruiz facts about "driving

the car that night," (S.A. 443); "Clay Street, the whole scenario about guns in a

gym bag," (S.A. 444); and that Ruiz "had been seen at the house that night by a

girl," (S.A.448). Sweeney testified that Raucci "was telling [Ruiz] everything about

the case, times, the kind of car, the house" (S.A. 449). Sweeney further testified

that Raucci:

> described the house to [Ruiz]; he described the floor
> where [the murders] occurred; he described the car that
> [Ruiz] was allegedly driving; he made mention of a bag
> with guns in it that they picked up from Clay Street;
> made mention of meeting, or seeing a female in front of
> this house who knew him and was prepared to identify
> him as being in the car. And also that after it occurred
> that they went back to Clay Street . . . .

 (S.A. 451).  These details that Raucci supplied to Ruiz became critical; they

feature prominently in the January 14, 1991 and May 28, 1991 statements that Ruiz

provided to Raucci and in his testimony during the *Lewis* criminal trial (S.A. 162-

52

164, 451-452, 456-457, 459, 460-461, 465, 467-468, 480, 484, 485-490). The state habeas trial court's finding that these details are "insignificant" is clear error, as is the finding that Raucci told Ruiz "only" about "an apartment on Howard Avenue; the color of the buildings and the petitioner's car was a BMW."

The State also ignores and misinterprets crucial facts in attempting to renew its argument that Sweeney was not credible (Resp. Br. 43). First, the fact that Sweeney did not prepare a report of the interview supports Mr. Lewis' proof that this important impeachment information was not disclosed to the defense. Second, Sweeney could not have reviewed a warrant in the Turner-Fields homicide as an arrest warrant did not exist on January 13, 1991. The record clearly establishes that the first arrest warrant issued in that case was not signed until April 12, 1991, after Raucci had extorted statements from Ruiz, Morant and Roque (S.A. 250-253). Ruiz was brought to the New Haven Police Department on the evening of January 13, 1991 on an arrest warrant Raucci had prepared charging him with the Javier Torres shooting.[33]  Sweeney did, however, testify that he had familiarized himself with the Turner-Fields investigation file (S.A. 491).

---

[33] The Ruiz arrest warrant was entered into evidence as Petitioner's Exhibit 10 during the state habeas proceedings (S.A. 493-495).

### b. The Sweeney Testimony Undermines Confidence in the Verdict.

The State ends by claiming (Resp. Br. 44) that even if Sweeney's account is credible, it "was dwarfed by everything else the jury heard." This is false. The evidence implicating Mr. Lewis was extraordinarily thin. Only Ovil Ruiz, a terrified teenager with a long documented history of psychiatric illnesses, testified to facts from which the jury could infer that Mr. Lewis had committed the crime. Without the testimony of "key witness" Ruiz, the State would have been unable to establish probable cause, much less obtain a conviction.

During nine days of evidence at the criminal trial, the State presented only two witnesses who offered any testimony connecting Scott Lewis to the crime -- Ovil Ruiz and Jose Roque. Ruiz was the only witness who testified that he had personal knowledge of Mr. Lewis' involvement in the homicide.[34] Roque, who had recanted prior to trial, insisted that Raucci had repeatedly stopped the taped interview so that he could tell Roque what to say. The defense presented witnesses,

---

[34] Rather than citing Ruiz' trial testimony, the State relies primarily on his written statements and Judge Blue's analysis of those statements in an entirely different context.  The statements Ruiz gave in January and May, 1991 were not entered into evidence during the Lewis criminal trial and were not considered by the jury. It is also apparent from the January statement, and from Sweeney's testimony, that Raucci had time alone with Ruiz both before and during the "interrogation" when he had ample opportunity to feed Ruiz facts.

including Mr. Lewis, who offered testimony and documentary evidence in support of his alibi.

The State called twelve witnesses. Seven of them (Marquis, Basilicato, Kanfer, Carver, Benson, Stephenson and Reho) testified about the crime scene and did not mention Mr. Lewis, Morant or Ruiz; an eighth witness (Barone) testified only about the dates that Ruiz was in Department of Correction custody. Contrary to the State's assertion (Resp. Br. 46), the State firearms expert Stephenson did not testify that "357 bullets had been used in the commission of the crime." Rather, he testified that because there was no firearm to make a direct comparison to, he could only testify that the general rifling characteristics of the bullets were consistent both with a .357 and with a .38 special caliber revolver (S.A. 181). He also testified that 1) if no shell casings were found, in all probability a revolver rather than a semi-automatic weapon was involved (S.A. 184); 2) that "out in circulation thousands, literally, thousands and thousands of revolvers match that description" (S.A. 185); and 3) that he was unable to provide more information about the gun used in the homicides without an actual gun for comparison (*id*.). NHPD dive team member Frederick Hurley testified about his unsuccessful efforts to find a gun in the Mill River off the Chapel Street Bridge (Tr. 5/3/95 at 6-13).

Diane Basilicato, who lived in the front apartment on the second floor at 634 Howard Avenue (where the Turner-Fields homicide occurred) gave testimony that

directly conflicted with Ruiz's testimony (S.A. 147-148). She arrived home

between 3:40 and 3:45 a.m. on October 11, 1990 (S.A. 149-150). When she got out

of her car, she encountered a man who appeared to be Hispanic and who was

"whistling, trying to get somebody's attention" (S.A. 153). She declined his offer

to help her with the laundry she was carrying but gave him a cigarette when he

asked for one (S.A. 154). A woman the whistling man appeared to know then

approached and began talking to both of them.[35] *Id.* Ms. Basilicato watched Ms.

Pearson and the whistler walk down the street, away from Yale New Haven

Hospital, and then entered her building. *Id.*[36] In her detailed account, she did not

mention having seen Ruiz or an idling car with its windows down and radio

playing.Ms. Basilicato got into her apartment at 4:01 a.m., a time she remembered

because she had looked at the clock. (S.A. 152.)

According to Ruiz, he drove Lewis' BMW from New Haven Hospital

southbound on Howard Avenue past Turner's building, before stopping "farther

---

[35] The NHPD identified, located and interviewed Sandra Pearson based on
Basilicato's interview.

[36] This testimony would have been corroborated by a police report about third
party suspect Michael Cardwell. Exclusion of the report was challenged on direct
appeal and raised in the federal habeas as a claim under *Chambers v. Mississippi.*
410 U.S. 284 (1973). The District Court found (A-28-32) that the troubling state
court record warranted review under §2254(d)(2) and that the state court decision
was unreasonable on one ground but that it was not unreasonable on an alternate
ground (A-53-64).

down at the corner" to wait for Lewis and Morant (S.A. 163). Ruiz's testimony

put him, the BMW and Ms. Martinez at the same corner and at the same time that

Diane Basilicato had observed Pearson and the whistler (S.A. 178-179; 154-155)

but Ms. Basilicato did not see anyone that night other than the whistler and Ms.

Pearson (S.A. 159).

Ruiz testified that after the shots, he pulled a quick U-turn and drove to the

front of 634 Howard Avenue, where he parked and waited (S.A. 178-179). But

Basilicato testified that after she heard gunshots, she went immediately to her

window for a second time and looked out onto Howard Avenue (S.A. 158). With a

clear view of the street both in front of her building and southward toward

Columbus Avenue—essentially, the entire area where Ruiz's story plausibly placed

him—Basilicato saw nothing (S.A. 155-159).[37]

The only witness, other than Ruiz, who mentioned that Mr. Lewis had any

connection to the crime was Jose Roque. As described in detail above (p. 6 *supra*),

Roque testified about the coercive circumstances under which Raucci took his

taped statement. The consistency between Ruiz's testimony and the recanted

statement of Jose Roque demonstrates the critical nature of the suppressed

impeachment information.  Access to the substance of Sweeney's testimony would

_____

[37] Basilicato reported clear visibility to the intersection of Howard and Columbus
Avenues from the porch of 634 Howard Avenue and her window above (S.A. 157-
158).

have allowed the defense to corroborate Roque's testimony that Raucci coached and coerced his statement. Had the defense known that Sweeney witnessed Raucci providing details to Ruiz about the crime during his first interview, it could have used that information to both impeach Ruiz and to rehabilitate Roque.[38]

The only other evidence the State cites to support the verdict is the letter Mr. Lewis readily admitted that he wrote to Ruiz. The State ignores (Resp. Br. 46-47) that it was entirely consistent with Sweeney's testimony. It urged Ruiz to "tell [the lawyer] the truth and you don't know anything about no murders" (Tr. 5/3/95, p. 127). As alleged in the Corrected Amended Petition, the letter was offered by the State but was not admitted during the Morant trial on the ground that it was not threatening (S.A. 56, ¶ 175; S.A. 121-134).

The State entirely ignores the evidence that Ruiz told Sweeney three separate times that he knew nothing about the Turner-Fields homicide. Even if these statements were untrue, they constituted critical impeachment information. It is hardly surprising that the May 1991 statement and Ruiz's trial testimony had additional detail. He not only faced charges on the Torres assault but had

---

[38] Although the FBI had conducted forensic analysis of the Roque taped interview and had determined that the tape was stopped 11 times in 22 minutes, this corroborative evidence was not revealed to Mr. Lewis until the District Court ordered disclosure by the FBI during federal discovery shortly before the federal evidentiary hearing (S.A. 254-261). The District Court did not rely on that evidence in its analysis under §2254(d) but it would be relevant to an evaluation of actual innocence under *Schlup* and *House*.

accumulated additional criminal charges in Woodbridge, CT (S.A.165-176). These charges were consolidated and the same prosecutor who represented the State in both the Lewis and Morant criminal trials represented the State during Ruiz's plea and sentencing on those charges (S.A. 176). Ruiz had ample incentive to refine and strengthen his testimony.

The District Court carefully reviewed the state court record, including Judge Blue's assessment that Sweeney was a credible witness. His testimony was extraordinarily powerful impeachment material that would have allowed Mr. Lewis to confront Ruiz with his own statements that he knew nothing about the crime. The District Court was correct in holding, under §2254(d)(2), that the state habeas court's finding that "all exculpatory evidence had been furnished to the defense" was "erroneous and unreasonable."

## CONCLUSION

This Court should affirm the District Court decision granting the writ of habeas corpus. If the Court finds procedural default, it should remand the case for further proceedings on the motion seeking an actual innocence evidentiary hearing and direct the District Court to allow Mr. Lewis to amend that motion in order to seek review of his *Brady* claim.

Respectfully submitted,


By _____/s/_____ Date: July 30, 2014
Brett Dignam Second Circuit Bar No. 85-719
Elora Mukherjee
Attorneys for Petitioner-Appellee Scott Lewis
Morningside Heights Legal Services, Inc.
435 West 116th Street - Room 831
New York, NY 10027
212-854-4291
Fax: 212-854-3554
Email: bdigna@law.columbia.edu

**Federal Rules of Appellate Procedure Form 6.  Certificate of Compliance With Rule 32(a)**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    ☑    this brief contains [13,798         words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    ☐    this brief uses a monospaced typeface and contains   [state the number of] lines of text , excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☑    this brief has been prepared in a proportionally spaced typeface using [Microsoft Word 2010           ] in [Times New Roman 14 pt      ], *or*

    ☐    this brief has been prepared in a monospaced typeface using [ state name and version of word processing program ] with [ state number of characters per inch and name of type style ].

(s)   **Brett Dignam**
_____

Attorney for  Petitioner-Appellee Scott Lewis
_____

Dated:  **July 30, 2014**
_____

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2014 a copy of the foregoing Brief for Petitioner-Appellee Scott Lewis was filed electronically. All counsel with appearances in this case will be notified of the filing and will have access to the foregoing via the Court's electronic filing system.  In addition, two paper copies of the brief have been served via first class mail on:

Michael Proto
Assistant State's Attorney
Civil Litigation Bureau
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, CT 06067


      /s/ Brett Dignam
Brett Dignam, Esq., Second Circuit Bar No.85-719
Morningside Heights Legal Services, Inc.
Columbia Law School
435 W. 116th St.
New York, NY 10027
(212) 854-4291
bdigna@law.columbia.edu